36 N.J. Super. 334 (1955)
116 A.2d 61
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY SICILIANO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 20, 1955.
Decided June 29, 1955.
*335 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. William J. O'Hagan argued the cause for defendant-appellant (Messrs. Stout and O'Hagan, attorneys).
Mr. George A. Gray argued the cause for plaintiff-respondent (Mr. Vincent P. Keuper, attorney).
The opinion of the court was delivered by CONFORD, J.A.D.
This is an appeal from a judgment of conviction of the defendant on the first of two counts of an indictment charging him with a violation of N.J.S. 2A:87-1, dealing with acts intended to accomplish an abortion. It charged him, in substance, with having used "divers instruments and means unknown" in and upon one Jane Harrison, a pregnant woman, with intent to cause and procure a miscarriage, on February 14, 1954, in the Township of Shrewsbury. A second count, of which defendant was acquitted by the court on motion at the conclusion of the entire case, *336 charged that he "advised and directed" Jane Harrison "to take divers drugs and medicines," with similar intent. Both counts allege that the woman died in consequence of the actions charged against defendant. One Henry Neuwirth was charged in both counts as an accomplice, but not tried.
A number of grounds of appeal are argued but our conclusion requires extended discussion of only one, the alleged insufficiency of the evidence adduced by the State, either at the conclusion of the State's case, or at the end of the entire case, to establish defendant's guilt of the charge laid in the first count. Motions for judgment of acquittal thereof were denied by the trial judge. The nub of the case, in our view of it, is whether the statute requires that there be produced evidence sufficient to permit a finding that some sort of "instrument or means" was used by the defendant in the perpetration of the offense, and, if so, whether any such evidence was adduced by the State.
N.J.S. 2A:87-1 reads as follows:
"Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor.
If as a consequence the woman or child shall die, the offender shall be punished by a fine of not more than $5,000, or by imprisonment for not more than 15 years, or both."

I.
The factual case proven at the trial against the defendant was this. An amatory association between Henry Neuwirth and Jane Harrison, both unmarried and in their early 20's, had resulted in her pregnancy. Neuwirth testified that at about 2:30 P.M. on Sunday, February 14, 1954 they arrived at the "Blue Jay" Diner in Eatontown. They sat in a parked car and waited for a yellow Buick convertible. Shortly thereafter a car of that description arrived, driven by defendant. Henry and Jane got into it. Jane said "Tony?" in a questioning tone. Defendant answered "yes" and asked, *337 "Do you have the money?", whereupon Jane and Henry each gave him $150 in cash. Defendant then told Henry he would meet him at the same place at about 6 P.M. and drove off with the girl in the Buick, proceeding in a northerly direction on Route 35.
There was evidence that defendant had access to the home of a Mrs. Appleby, a widow friend of his, in Eatontown (Shrewsbury Township) and that his car was seen parked there at various times in the afternoon of February 14, when she was not at home. Neuwirth testified that at about 6.00 P.M. he drove back to the Blue Jay Diner and within a few minutes the defendant drove up in his yellow Buick with Jane. Together they helped her into Neuwirth's car. She was not feeling well or able to walk very well. The defendant told him she was not feeling well and that she should rest the next day. Neuwirth informed him they would be staying at Dale's Drive-In, a motel, and proceeded there with the girl, spending the night with her. Jane had cramps and pains all night and couldn't walk. The following morning, said Neuwirth, the defendant came "to see how Jane was feeling" and left some pills for her, saying, "Well, if you take these pills * * * every so often * * * you will feel better as soon as you pass this clot and you will be up on your feet the next day."
The girl's pains continued all next day, February 15. The defendant came there in the evening, according to Neuwirth, offered to give her an injection, which she refused, and left more pills. He said that if she got worse Neuwirth should call him at an Eatontown phone number which he gave him. Jane's condition became worse that night and during the next day, Tuesday, February 16. That evening Neuwirth phoned Dr. Kelemen, who directed him to take her to the Hazard hospital, and he brought her there at 10:00 P.M. He said he then phoned and told defendant what he had done and asked him to meet him and bring him $100 as he would need some cash. Defendant complied. On cross-examination he said the arrangements with defendant had been made by the girl, not him.
*338 There was testimony by a Long Branch detective that defendant was confronted with Neuwirth at the Long Branch Detective Bureau in the early morning of February 17 and that the latter was asked, "Is this the man that you paid the $300 to for the abortion?", replied, "Yes, that's the man," and that the defendant remained silent. There was also proof that defendant was brought to the hospital and into the presence of the girl, that she was asked whether he was the man who committed the abortion and that she replied, "that's the man."
Dr. Kelemen, a surgeon, examined Miss Harrison upon her admission to the hospital, found scanty vaginal bleeding, that she had abdominal pain and was unable to retain food. He catheterized the bladder, removed urine and administered intravenous fluids. On the morning of February 18 he performed a "dilatation and curettage" on the patient. This consists of a dilatation of the cervix (opening of uterus), an instrumental entry of the uterus and a scraping out of its contents. The contents were sent out for laboratory examination and analysis. This was the extent of the direct examination of the physician. The girl remained at the hospital until February 23, when she was removed to a hospital in New York, and she died there the next day. On cross-examination, counsel for defendant established that the hospital record contained an entry by Dr. Kelemen, on admission of the patient, that "Patient has a severe oliguria, possibly due to self-induced drugs?" An oliguria is an insufficiency of urine passage. There was also a notation, and the doctor confirmed the fact, that "Patient and husband deny criminal abortion." (Neuwirth originally represented himself as Miss Harrison's husband.) It was further shown, on cross-examination of the doctor, that there were no marks or lacerations on the cervix before his operation, but there were some afterward as a result of it. He said, however, that the absence of marks was not necessarily an indication that there had been no instrumental entry previously. The contents of the uterus was a tablespoon of tissue peculiarly stained or discolored, as by a drug. The discoloration of the *339 blood was not that "typical of an incomplete abortion," but, rather, "as though the blood had been acted upon by a chemical substance rather than ordinary dissolution attendant with its duration of time following exposure of the blood itself." On redirect examination, over objection, the doctor was permitted to testify that after admission of the girl, Neuwirth told him that "something had been done"; also, that the tissues he removed from the uterus were tissues "of conception," indicating there had been a pregnancy. There was confirmatory testimony that the specimen from the uterus sent out for analysis was part of an embryo or foetus. A medical pathologist who performed an autopsy on the body of the girl testified that the cause of death was "post-abortive septic endometritis," or infection following an abortion.
Defendant testified in his own defense. He said he never saw or knew either Neuwirth or Jane Harrison on February 14, 1954 or prior thereto. He categorically denied each item of Neuwirth's testimony concerning his alleged dealings and conversations with them. He gave a detailed account of all of his activities on February 14 and his testimony was directly corroborated by a number of witnesses. All of his time on that day was accounted for in such a manner as to purport to exclude his having been at the Appleby home between 2:00 P.M. and 6:30 P.M. on that day. There were witnesses who testified his car was not parked there at various times and periods during that interim. He explained his silence on the confrontation by Neuwirth on the basis that he was upset over the arrest and the serious illness of his father (who died not long after); and that he subsequently told the detectives he was innocent; and, as to the confrontation by the girl at the hospital, he said counsel had advised him to say nothing, that he was told at the hospital the visit must be short and very quiet and he did not wish to upset her by a scene and argument. There was other evidence that she was "disoriented" and that her speech was "rambling" on that day.

*340 II.
A better understanding of the setting in which there arose the main legal question presented on this appeal requires more than cursory reference to the handling of the motions for judgment of acquittal at the trial. On the motions at the conclusion of the State's case, it was argued for the defendant that the bill of particulars furnished by the State had, in effect, constituted an abandonment of the second count of the indictment  that dealing with the alleged administration of drugs and medicines. This was on the basis that the State's answers in the bill, to separate questions in the order therefor, as to the "manner" in which and the "means" by which the "abortion" alleged in each count "was performed," were, in each case, "By use of an instrument or instruments, the names of which are presently unknown to the State." The argument was that "instruments" could not comprise "drugs," etc. As to the first count, the contention was that there was no evidence whatever to indicate that the abortion had been performed by instruments. The trial court indicated, on the argument of the motion, that it was impressed, saying to State counsel, "You haven't shown that this abortion was caused by an instrument. There is no testimony at all from which any possible inference could be drawn that an instrument was used," in which the latter concurred, but contended that it was caused by "means unknown." The trial court also indicated that the State was precluded from relying upon any charge other than as circumscribed by the bill of particulars. In the contingency thus presented the State moved for leave to amend the bill so as to allege, as to each count, that both the "manner" and the "means" charged in each count was "by means unknown to the state." Over strenuous objections of surprise by the defense, the motion to amend was allowed, the motions for acquittal on each count were denied and the defense was granted a two-day continuance, rather than the three weeks requested, to prepare to answer the broadened case supposedly presented by the amendment.
*341 On the renewal of the motion for judgment of acquittal at the end of the entire case, the trial court denied the application as to the first count, without comment. As to the second count, the court concluded that it could not be supported by the evidence as to the pills administered to the girl on February 15 and 16, the indications and the theory of the State being that she had been aborted on the afternoon of February 14, and, upon the State's concession that there was no evidence of the administration of drugs prior to the 15th, the court dismissed the second count with substantially no objection from the State. In submitting the case to the jury the court informed it that the second count had been dismissed for lack of proof of administration of drugs, that there was no proof that the miscarriage, if any, was caused by any instruments and that accordingly the State was limited to the words, "means whatever," and that the jury was to determine whether "means whatever" had been used. There was a verdict of conviction and a sentence of imprisonment for from ten to fifteen years.
The conception entertained by the trial court and the defense of the function of a bill of particulars was erroneous.
"The theory of ordering particulars is to limit the proof to matters specified in the bill of particulars and to enable the other party to meet his opponent's proof without danger of surprise. Consequently such bills have relation to the trial, and not to the record." State v. Lehigh Valley Railroad Co., 94 N.J.L. 171, 174 (E. & A. 1920).
It was there held that a bill of particulars could not have the effect of altering the content of the indictment so as to eliminate the criminality of the offense or put it out of the scope of the indictment. E converso, an indictment deficient for want of a statement of the essential facts may not be saved by a bill of particulars. See State v. Gibbs, 134 N.J.L. 366, 370 (Sup. Ct. 1946); State v. Sullivan, 33 N.J. Super. 138, 141 (App. Div. 1954).
So far as the second count was concerned, accordingly, defendant was not entitled to consider it vitiated or abandoned *342 by the filing of the bill of particulars. His right was solely to object to the introduction of any proof by the State designed to establish the use of drugs or medicines as beyond the constriction by the bill in relation to that count, and, if successful in doing so, to take advantage of the result by motion to acquit. See State v. Lehigh Valley Railroad Co., supra (94 N.J.L., at page 174); State v. Mowser, 92 N.J.L. 474, 479 (E. & A. 1919). All of the foregoing is, of course, subject to the discretionary right of the court to grant an amendment of the bill at any time, consistent with justice. R.R. 3:4-6; 42 C.J.S., Indictments and Informations, § 243, p. 1262. Here, anomalously, there was not only no objection by defendant to any proofs on the ground of transgression of the bill in respect to the second count, but the deliberate development by defendant of proof of drugs or chemicals in the uterus of the woman, on cross-examination of Dr. Kelemen. Thus defendant could not appropriately charge surprise in respect to any unforeseen attempt by the State improperly to develop proofs beyond the limitation of the bill. His surprise was only in the State's insistence on maintaining its case in respect to the second count, a right which it did not forego by filing the bill of particulars, as noted above. For these reasons, and since the second count was dismissed at the end of the case, the amendment of the bill did defendant no harm. We have been at pains to express the foregoing views as perhaps helpful if this case is retried in consequence of our determination herein. But the appeal turns on another question. Was there proof of the essential elements of the offense charged in the first count sufficient to withstand the motion for acquittal made at the end of the State's case and renewed at the end of the entire case?

III.
As has been seen, the defendant was acquitted by the trial court of the second count, the charge of administering drugs or medicines. It instructed the jury that there was no *343 evidence of use of instruments and delegated to its decision only the question as to whether the defendant had used "means whatever," referring to the language of the statute. The wording of the indictment is "means unknown," but we regard the difference as of no consequence, for present purposes. The effect of this was to grant the motion to dismiss the first count in part, i.e., insofar as it charged the use of "instrument," but not to the extent that it charged the use of "means." The theory of the trial court appears to have been that the statute, indictment, or both, invested the State with the burden to submit proof of use of some kind of drug or medicine, or some kind of instrument, failure of which would be fatal to the charge in those aspects, but that the charge in the first count could nevertheless survive a failure to adduce proof that any kind of means, aside from drugs, medicines or instruments, was used, the jury being free to find that an unspecified and unknown other means was used, apparently solely from the proof that an abortive miscarriage had been performed by someone. In this we think the trial court fell into error.
It is apparent from a mere reading of the statute that abortion, as such, is not the offense made punishable thereby. See State v. Lisena, 21 N.J. Misc. 180, 185 (Q. Sess. 1943), affirmed 131 N.J.L. 48 (Sup. Ct. 1943). It is the unlawful administering, prescribing, advising, or directing a pregnant woman to take or swallow any poison, drug, medicine, etc., with intent to procure her miscarriage; or the use of any instrument or means whatever, with such intent. We are thus not to decide whether the evidence warrants an inference that the defendant committed an abortion, but solely whether it may support a finding that he used an instrument or means, other than drugs, medicines, etc., as charged in the remaining count. If it does, there was ample proof of intent and pregnancy. For present purposes it makes no difference whether the direction of the court to the jury mentioned above effectively narrowed the issue.
Broadly, the statute contemplates two kinds of prohibited exercise, (a) the prescribing of medicines, drugs, etc., (b) the *344 use of instruments or means  in either case with the specified intent. See State v. Mandeville, 88 N.J.L. 418, 421 (Sup. Ct. 1916), affirmed 89 N.J.L. 228 (E. & A. 1916). Cf. State v. Weiss, 130 N.J.L. 149, 153 (Sup. Ct. 1943), affirmed 131 N.J.L. 228 (E. & A. 1944). The employment of either class of methodology is a separate and distinct offense which might "be made the subject of an independent criminal prosecution." (Id., 88 N.J.L., at page 421). The separateness of drugs and medicines, etc., and instruments and means, as classes of prohibited devices for the invidious purpose, is manifested from their respective listing in subparagraphs (a) and (b) of the Revised Statutes, R.S. 2:105-1, from which the present statute is derived, and in the structure and punctuation of prior enactments, e.g., L. 1898, c. 235, § 119, p. 827 (C.S. 1910, p. 1784, § 119). The New Jersey pattern of specifying the proscribed media stems from the original enactment, L. 1849, p. 266, approved March 1, 1849. See State v. Drake, 30 N.J.L. 422, 427 (Sup. Ct. 1863). It is characteristic of most of the statutes on this subject in this country and in England. 3 Burdick, Law of Crime (1946) § 859 et seq., pp. 267 et seq. For example, § 1 of 43 Geo. III, ch. 58 (1803) dealt with "deadly poison, or other noxious and destructive substance or thing," and § 2 with "any medicine, drug, or other substance or thing whatsoever" and "any instrument or other means whatsoever."
It is fundamental that where the administering of drugs or medicines, and the use of instruments or other means, are specified in the statute as prohibited if intended to procure a miscarriage or abortion, they constitute "essential elements" of the crime and must be alleged and proved. State v. Sturchio, 131 N.J.L. 256 (E. & A. 1944); 3 Burdick, op. cit., supra, § 862, p. 274; 1 Am. Jur., Abortion, §§ 9, 27, pp. 135, 141, 142; Commonwealth v. Viera, 329 Mass. 470, 109 N.E.2d 171 (Sup. Jud. Ct. 1952); Traylor v. State, 101 Ind. 65, 68 (Sup. Ct. of Jud. 1884); Commonwealth v. Smalansky, 64 Dauph. 310, 316 (Pa. O. & T. Dauphin Cty. 1953); Commonwealth v. Lawton, 14 Dauph. 186 (Pa. Q.S. Dauphin Cty. 1910); State v. Coran, 87 *345 Ohio App. 238, 94 N.E.2d 562, 563 (Ct. App. 1948); People v. Collins, 80 Cal. App.2d 526, 182 P.2d 585, 590 (D. Ct. App. 1947).
We are not intending to suggest that there is any device, method or artifice, the unlawful use of which in, on or in connection with a pregnant woman, with intent to cause or procure her miscarriage, is beyond the penalty of N.J.S. 2A:87-1. On the contrary, we deem it all-embracive. The words, "or means whatever," are clearly intended as an omnibus gathering together of every object or method for the illegal purpose not comprehended within the references to drugs, medicines, etc., or any instrument. But this is not to say that it was the legislative intent, while requiring as an essential element of the crime proof of use of drugs or medicines of some kind, where so charged, or of an instrument of some kind, where so charged, to permit the conviction of a defendant on proof devoid of evidential suggestion of any particular or general means or type of means, founded solely on such a charge as the reference to "means unknown" in the first count of this indictment. Tolerance of such a result would be to use the generality of the statutory phrase, "means whatever," employed, as a matter of semantics only, for universality of coverage, to disintegrate the unquestionable and generally recognized legislative intent that the means employed, not necessarily specifically, but at least generically, be proven as an essential element of the offense. This requirement has not been too burdensome on New Jersey prosecutors. There was, for example, under necessarily liberal standards of sufficiency of evidence in this kind of case, proof of use of instruments of some kind in State v. Sturchio, 130 N.J.L. 259, 260 (Sup. Ct. 1943), affirmed State v. Sturchio, supra, and in State v. King, 133 N.J.L. 480, 482 (Sup. Ct. 1945), affirmed 135 N.J.L. 286 (E. & A. 1947); of fingers in State v. Barnes, 75 N.J.L. 426, 427 (Sup. Ct. 1907); of douching with a "substance" in State v. McFadden, 128 N.J.L. 130, 131 (Sup. Ct. 1942); and of "physical interference" in State v. Lisena, supra (131 N.J.L., at page 50). Examples might be multiplied. But in the present case *346 there was, we agree with the trial court, no evidence whatever of the use by defendant of instruments, nor any more of the use of means other than instruments. In view of the dismissal of the second count we have no occasion to express any view as to whether there was evidence of administration of drugs or medicines.
It should go without saying that the State can draw no sustenance, in attempting to uphold the conviction on count one, from any evidence within the scope of count two. That count having been dismissed, it is now as though but one count was charged. The counts each charge a crime which is separate and distinct from that set forth in the other. DeJianne v. United States, 282 F. 737, 741, 742 (3rd Cir., 1922); State v. Alfin, 129 N.J.L. 196, 197 (Sup. Ct. 1942).
"A failure of proof of the act selected by the State in support of the charge of the indictment [here transpose "count"] is not a reason for searching out another separate and distinct offense in proof of the indictment [transpose "count"]." State v. Grothmann, 13 N.J. 90, 98 (1953).
To borrow another analogical statement from the same decision, "the accused cannot be tried for `two crimes under the charge of one'" (13 N.J., at page 97). It was said in State v. Algor, 26 N.J. Super. 527, 531 (App. Div. 1953), that "it is * * * fundamental that every constituent element of the crime charged must be set forth in the indictment and not left to intendment." How much more vital is it, in meaningful implementation of the key principle of our criminal jurisprudence, the all-pervading presumption of the innocence of the accused, that it be insisted that there be proof for "every constituent element" of the charge, lest the presumption die by mere hunch or prejudice of the jury.
Nor are we impressed with the argument by the State that it could make no difference to the defendant what the means used was, in view of the defense of alibi. We do not consider that defendant's right of assertion of alibi had to be purchased *347 at the price of surrender of the right to compel the State to prove every essential element of the crime charged.
The case of Commonwealth v. Lawton, supra, is almost directly in point with the situation here presented. The court had before it a motion in arrest of judgment and for a new trial. The defendant had been tried on an indictment containing eight counts, wherein he was charged with administering, severally, a drug, poison, and other substances to the deceased, with using an instrument upon her and employing "other means to the grand inquest unknown," each with intent to procure her miscarriage, in consequence of which she died. The jury found the defendant guilty only of the count in which he was charged with the use of means unknown. There had been evidence of marks upon the womb of the deceased which the court said constituted some indication of the use of an instrument, and of pregnancy and miscarriage, together with proof of defendant's presence during the last illness of deceased, illicit relations between the two, and of a statement by him that he "had helped her out before." The court granted the motions requested. It said it had submitted the case to the jury only on the basis that there was evidence by which the count for use of instruments might be found proven, but that, in view of the verdict of acquittal of that count, the question was whether there was evidence to support the charge of use by other means. It found none. It said (14 Dauph. 186, 187, 188):
"There was no evidence of the `certain means,' which were charged to have been used, in the count upon which the defendant was convicted. The count was good, although it charged that the means were unknown to the grand inquest, but, when it came to trial, it was incumbent on the commonwealth to show to the jury what the means were. In this particular the evidence fell short. * * * There are many circumstances of suspicion in the case, such as the illicit relation of the defendant with the deceased, his conduct and his statements after her death; but a conviction cannot be sustained on suspicion. The commonwealth is bound to produce evidence that points to the commission of a crime beyond a reasonable doubt and to fail to show that unlawful means were used to procure the miscarriage is to fail to show that which essentially constitutes the offense of which the defendant was found guilty."
*348 The Pennsylvania statute involved in the foregoing case corresponds with that of this State in essentials. There, as here, the jury in effect found against the defendant only as to the use of unlawful means, other than instruments or drugs, there being an acquittal of use of either of the latter, there by the jury, here by the court. In both cases there was lacking proof of any "means," apart from instrument, drugs, etc. Cf. People v. Gomez, 41 Cal. App.2d 249, 106 P.2d 214, 215, 216 (D. Ct. App. 1940), where the exact means was not proved, but there was evidence that defendant had planned an "operation" on decedent; and Commonwealth v. Bricker, 74 Pa. Super. 234 (Super. Ct. 1920), where there was evidence both of a proposed "operation" and the administering of a prescription. A recent decision of the Pennsylvania Court of Oyer & Terminer of the same county, Commonwealth v. Smalansky, supra, acknowledges the authority of the Lawton case, but finds it not in point in the light of evidence in the later case permitting an inference of use of instrumentation by the defendant. The ratio decidendi of the Dauphin County Court of Quarter Sessions in the Lawton case parallels our own. While the indictment may allege that the means by which the offense was committed is unknown, R.R. 3:4-3, proof must be forthcoming at the trial.
For the reasons set forth herein, we are constrained to conclude the judgment under appeal must be reversed. This applies whether the entirety of the charge in count one is to be taken as the standard for the requisite evidence, or the curtailment thereof by the court, in its charge to the jury, to the accusation of use of "means whatever." As the case may be retried we observe that we have considered the other grounds of appeal urged by appellant and find no other reversible error. As to the procedural course of this matter hereafter, see State v. Lamoreaux, 20 N.J. Super. 65, 76 (App. Div. 1952).
Reversed.